Good morning. My name is Albert Levin. I represent the appellant Nelson Machado, Jr. I also represented Mr. Machado at the trial level. The inability of a defendant to adequately prepare a defense strikes right to the heart of our criminal justice system. In this case, Mr. Machado was deprived of that right because of a failure to bring him to trial in a speedy fashion. We are alleging a constitutional violation pursuant to the Sixth Amendment of his right to a speedy trial. Factually, Mr. Machado was investigated and in or about November of 2009, a special agent from a Florida joint task force working along with the FBI went to visit him. Essentially, they were investigating activities that had taken place in September of 2005. They went to see him in 2009. They made contact with his parents initially. Ultimately, they made contact with him telephonically. He explained to them that he spoke very little English and that he was then advised by the agent, and this is where the lower court erred, he was then advised by the agent that the agent would get back to him after he had procured the services of a Portuguese translator. The agent never got back to him. In April of 2010, he was indicted. He had planned to move back to Brazil back in 2007 and did just that during the early part of 2010. In April, he was indicted. It was uncontroverted that he knew nothing about the existing indictment and did not become aware of the indictment until he was arrested in January of 2016, coming off of a plane from Brazil. The argument essentially when you apply the four-pronged Barker versus Wingo test comes down really just to one factor. Did the government exercise due diligence in locating Mr. Machado? We submit that they did not. What is it that the government didn't do that they were legally obliged to do that yields a reversal in this case? The only thing that they did was on one occasion when the agent went to go arrest Mr. Machado with the indictment and he could not locate him, he then went to the church. Correct me if I have the facts wrong. I thought that the agent in fact did go to the church, did speak to a secretary of the church, did ask her where Machado was and he was told by the secretary that Machado had left the country and gone to Brazil. Is that accurate? That is accurate, your honor. What they did not do was they did not inquire any further because they easily could have made contact with Mr. Machado in Brazil. They got no information from them as to where or how to contact him. They inquired nothing along those lines of any family member that still remained in the Bradenton, Florida area and they merely were informed and did not act upon the fact that they were told that he had gone to Brazil. That did not relieve them of any obligation. They have a legal obligation to try and extradite him? They seem to suggest that. They had a legal obligation to attempt to procure his return to the United States which would include extradition. Has any case ever held that the failure of the United States to seek extradition from a foreign sovereign of a defendant who's left the country voluntarily amounts to reversible error? No, your honor. The reason I raise the question is that extradition is a tricky thing and it depends on the nature of the charges and it depends on the extradition treaties, if any, with different foreign sovereigns. And there are a whole bunch of places where you can get extradition for crimes of fraud, tax fraud, and the like. Is there any indication that if they had tried to extradite Machado from Brazil that they could have succeeded in doing that? Respectfully, that is not the analysis. The analysis is what efforts... No, no, but I'm just asking a different question. Is there any, do we know from the record whether Brazil would even extradite him for these charges that discusses extradition other than the court, the lower court, saying that the government had no obligation to try to bring him back from a foreign country? Now, curiously, the warrant that's lodged in the NCIC system talks about extradition. That is, that they would be seeking extradition if he were located. And it doesn't matter whether he's extraditable or not. The issue is what efforts do they make to locate him? Let me ask you this question. Yes, Judge Anderson. It seems to me that what the government did in this case is comparable to, or perhaps more diligent than, what the government did in the case of the United States v. Baga, B-A-G-G-A. Are you familiar with that case? I am not, but in that case, the government went to the house, went to a restaurant that was associated with the defendant's wife. Very similar to this case, where he went to the house and then went to the church. The government then registered it with the national databases, all of which happened here. And in addition here, the district court found, and there's evidence, of course, to support it, that Agent Wagner checked from time to time, monitored the databases. And the court in Baga held that there was a reasonable effort to locate him. We held that that was not clearly erroneous. It seems to me that that case is, our case is, controlled and may even be more diligent here than what happened there. Your Honor, respectfully, the facts in this case are far different than the Baga case. Well, you said you hadn't read it. Well, based on what the court has told me, what the Baga case says. What I've just told you . . . You told me that in the Baga case, they went to the defendant's residence. Right. They went to speak to his parents. They didn't do any of that here. Well, they went to the residence, and then they went to the church. Respectfully, they went to the residence to locate him. He wasn't there. There was another couple that was living there. They had information about Mr. Machado that they did not, that the agent did not follow up on. Exactly the same thing happened in Baga. And in Baga, the court said, the argument was made that they could have found the address by talking to the congressman who knew the address. There had been correspondence by talking to the consulate or by talking to INS. In other words, there were ways that they could have found the address there. And the same thing, I mean, they could have asked the people at that restaurant exactly the same thing as the church in this case. And what we said about that is that we cannot fault the agents for not checking with these people on the off chance that they might have knowledge that the Baga's exact address in India. He had gone to India under more innocent circumstances than in our case. The defendant in Baga went to India because his wife was there and had a nervous breakdown. Here, there's actually some suspicion as to the defendant leaving under a month after the special agent talked to him. Your Honor, but respectfully, the record in this case shows that he had been planning to go back to Brazil some two years prior to the agent's initial contact with him. And then, in fact, during the period of time between 2010 and 2016, actually had come back to the United States on two occasions and had spent approximately three and a half months here. With regard to the agent doing his due diligence, in the Baga case, based on what the court is relating to me, the agent in that case actually handled the data aspect himself, had actually gone through the records, had gone through, had checked databases. All this case says is he registered it. He doesn't say he monitored at all. And in our case, we know that both Wagner and his analyst monitored. Well, respectfully, Your Honor, on cross-examination, Agent Wagner admitted that he had allocated that task to an analyst to do that. And only on one occasion did he note in a report . . . That is the finding of the district court, and it was not monitored by the agent that testified. His testimony was that he had allocated that to certain analysts. And the only documented report was when he learned that Mr. Machado had applied for a driver's license, a credit card, and had opened a bank account. Part of the difficulty you have is the district judge made a number of findings of fact. Among the other findings of fact the district court made was that he believed Wagner when Wagner said he had no recollection of Machado calling him in February 2010 or giving him contact information in Brazil. And beyond that, the district judge finds as a fact that the government proceeded in good faith. That's fact-finding, isn't it? It is. So you've got a tall order. You've got to show that that was clear error. But I want to go back to just see if I have an accurate recitation of what the agent did do. One, he went to the house and said he wanted to talk about some properties Machado had bought in Lee County, and Kelmer told him they were out of town. True or false? True. Two, Wagner returned to the Bradenton address in an attempt to arrest him. I take it that was after the charges had been lodged. Yes, that's correct, Your Honor. True? Yes, true. But someone else was living in the house, and that person thought Machado moved back to Brazil. That's at least what the agent was told. True? True. Three, Wagner then went to Machado's church soon after going to the house to see if he could find him there because he had served as a pastor at the church. Machado was not there, and a church employee told him that she thought Machado had moved back to Brazil. True? True. Four, Wagner then contacted Homeland Security and was told that Machado left the United States in March of 2010. True. Five, thereafter, Wagner periodically checked different databases to see if Machado had renewed his driver's license, including going to the officials in Georgia. Right? Clarified by Special Agent Wagner on cross-examination that he personally had not done that, but an analyst had. Right, so he had someone at his direction do that. Right. And also sought to check whether, maybe through this analyst, Machado had gotten a job in the United States. That's true, too, right? Yes, it is. Six, he confirmed that the arrest warrant for Machado was entered into the NCIC system soon after the April 2010 indictment. True. And then the database checks did not include checking for bank accounts or credit cards. That's correct. And then the February 2014 check revealed nothing to indicate that Machado had returned to the United States. But he had no recollection of Machado calling him twice in February of 10, and no recollection of Machado giving him contact information in Brazil. Would that be a fair statement of the record? And you say that finding by the trial judge was clear, Eric? I do, and the record to me is clear that in November, when he did have contact, when he did have a conversation with Mr. Machado, he unequivocally told him, I'll get a Portuguese translator and I'll get back to you, and never got back to him. So from that point, Machado had absolutely no knowledge that anybody was looking for him with regard to this matter. Right. There's no proof that he knew he was under indictment. That's clear. Yes. The only question is whether the government had made a diligent, good-faith effort to find the defendant and bring him to trial. They didn't have to exhaust all possible remedies, but they had to be diligent and proceed in good faith. Diligence, Your Honor, most respectfully to me, would have been going to speak to his parents, leaving a message with his parents, speaking to them and saying, hey, your son is wanted here in the United States, or we'd like to speak to him, speaking to the pastor of the church, the pastor that had taken over for him. Did the parents live near where his house was in Bradenton? Yes, and they had been to the parents' house. Rather, Special Agent Wagner had been to the parents' house previously, and made no attempt to go make contact with the parents again, or attempt to locate his whereabouts in Brazil, which is the crux of our argument is that he could have been more diligent in doing that. How was he obliged to go forward and find the whereabouts in Brazil? What is it the agent should have done in Brazil that he didn't do? He worked for an organization called the Assembly of God. With today's technology, if you Google the Assembly of God, you would have found some contact information in Brazil for this entity. He could have spoken to the pastor that had taken over for him to at least find out who's your employer. Was there any record evidence that there were Assembly of God outlets in Brazil that was presented to the trial court? Indirectly, based upon the fact that Mr. Machado was a pastor that worked with this denomination, the Assembly of God, and that they did have outlets in Brazil. There was nothing specific with regard to where he might have pastored in Brazil, but it was clear from the record that the Assembly of God was an entity, a viable entity, that there could have been more investigation of to locate Mr. Machado. And that's where the lack of due diligence comes in with regard to our argument. Thanks very much. You've reserved five minutes for your rebuttal. Thank you, sir. Good morning, Your Honors. Good morning. I'm Holly Gershaw on behalf of the United States. Machado basically just conceded that the only issue with respect to the speedy trial analysis is whether the district court clearly erred in finding that the United States used due diligence in its attempts to locate Mr. Machado. The district court did not clearly err. Is due diligence – isn't due diligence a mixed question of fact and law? One thing to say, they proceeded in good faith. I don't know that that's the same thing as a finding of due diligence being reviewed only for clear error. Maybe I'm wrong about that. In Villarreal, the court discusses how there's sort of two standards that this court has used in reviewing the district court's determination of reasonable diligence, and it says that in some cases they've reviewed it for clear error, such as in the Baga case, and in other cases they've reviewed it under a – What is the it that's being reviewed? If there's a determination that the Speedy Trial Act was or was not violated under the Fifth and Sixth Amendment, that would be reviewed de novo by this court, would it not? Correct. Okay, so we're looking at the building blocks that go into that. Good faith is a finding of fact. Correct. Is due diligence a finding of fact? I think reasonable diligence is a finding of fact, that the United States was reasonably diligent. Like I said, in Villarreal, the court did say that there are some cases that have applied the clear error standard. There are some cases that post-Doggett have applied a considerable deference. But regardless of the standard, if you look at it from a considerable deference, reviewing the district court's determination from a considerable deference standard or clear error, the result would be the same. But I would also point out that in Villarreal, the court considered whether or not he had shown actual prejudice under a clear error standard, and it wouldn't seem consistent to say that that is reviewed for clear error, but reasonable diligence is reviewed under a different standard. But, again, the facts in this case are almost completely analogous to BAGA, as Judge Anderson pointed out. The United States is under no requirement in every circumstance to try to locate a defendant who is living freely in another country and bring them back. The United States is only required to be reasonably diligent, and here the United States was reasonably diligent. If they knew where he was in Brazil, wouldn't due diligence have suggested they should call him there? That would be a different factual circumstance, and I think that that probably would be more negligent of them to not have followed up on that lead. Would it be due diligent for an agent, after securing an indictment for a grand jury, and learning from multiple people that he had gone back to Brazil from whence he came, if you knew where he was in Brazil and you made no effort to notify him in Brazil that he was under indictment, or to secure his appearance in any other way, would that be due diligence? It would depend on the facts and circumstances of the case, because if the agent had a good reason for not notifying him, such as we think if we tell him he's going to flee somewhere else or he's never going to come back to the United States and we're never going to have an opportunity to find him, Was there any evidence from the case agent that he did not want to publicly alert him to the fact that he was under indictment because that would deter him from coming back? No, there's no evidence in this case. But there also was no evidence in this case that the agent knew where in Brazil this person was located. And Machado was just asking this court to speculate that had they asked these people at his church or in the Bradenton community that they would have somehow pointed him in the direction of Mr. Machado's location in Brazil. But as the court said in Baga, the United States isn't required to pursue every lead on the off chance that somebody might have this information. And especially in this case where there's no evidence in the record that any of these people did have that information. What the United States did was reasonably diligent, in line with the Baga case and other cases that say put it in the NCIC database. You make reasonable efforts to check other databases, follow up on leads. And in this case they caught him on the third time that he came back into the United States. In the entire period of time that he was living in Brazil, he only came back to the United States for three months. He didn't come to Bradenton where he had been living before. He went to his sister-in-law's house in Orlando. There was no reason for the... In the Baga case, that was a case, it seems to me, of complete innocence on the part of the defendant. He left, Baga left, because his wife had a nervous breakdown in India. Do we not have to assume in our case that our defendant is also completely innocent? Obviously we know that the jury rejected his alibi about his being duped. So we know now that he was not duped. And at least we know the jury found he was not duped. And therefore he should have been suspicious of the agent wanting to talk to him about the Lee County properties that we now know the jury found he should have known were fraudulent. But we really can't consider that, can we? Because this motion to dismiss is before the trial. The judge has to decide it on the basis of the facts there. And the facts there is he's presumed innocent. Is that not true? There is one wrinkle here, Your Honor. And that's the fact that Machado renewed his motion to dismiss for speedy trial grounds at the close of trial and the district court denied it again. So I think we can't actually look at everything that happened in trial in making the determination of the reasonable diligence in Machado's knowledge. But I'd also like to point out that I agree with you that the district court did not make a factual finding that Machado was the reason for the delay, that he willfully evaded. Well, actually, he didn't make a finding, a fact there, but he found that that second reason, the second bark of fact, delay, reason for the delay, he found it weighed heavily against the defendant. Which makes me think he probably did think it was that he was not innocent. But I think that was a finding, a law, a question of law, the ultimate decision of whether it weighs heavily or which way it weighs. And I think the court was free. It would not have been a mistake for the court to weigh the factor heavily against Machado based solely on the fact that the United States was reasonably diligent in pursuing. Because as the court said in Doggett, if the United States reasonably pursues a defendant from indictment to arrest, a speedy trial violation will not be found absent a showing of prejudice. So the court has recognized that when the United States is reasonably diligent, that weighs very heavily against the defendant in the analysis. But what the district court did consider in his analysis was the agent went to Mr. Machado's house to talk to him, left a card with his parents. Machado called him back and the agent spoke to his wife and he said, we want to talk to you about some properties in Lee County. At that point in time, those properties I believe had already gone into foreclosure. And the agent says, I'm going to get a Portuguese translator and I'll get back to you. But less than about a month after that, Machado left the country and went back to Brazil. And he didn't contact the agent and say, hey, I know you're planning to get back in touch with me, but I'm leaving the country, here's how to get back in touch with me. Or when he came back into the country in Orlando for brief periods of time, he didn't call the agent and say. You're suggesting that there's some little evidence from which the judge could infer some culpability on the part of this defendant. Correct. And again, not an intentional evasion, but certainly this isn't the sort of case where you would say the United States wasn't reasonably diligent because . . . But there's no indication the judge did that. Other than his statement in the record that . . . in his findings that Machado left the country and never contacted the agents again. I'm looking at the order and the district court does say in its fact findings, while there is no evidence the defendant knew he had been indicted, he did know Agent Wagner wanted to talk with him about real estate located in Lee County. Then he came back three times and never went back to his residence or former employment. So the district court says this fact weighs heavily against the defendant. Correct. I mean, I think there's some consideration that he wasn't doing anything to help the agent. Correct. And he knew the agent. Now, whether that means he's totally innocent or not innocent, he doesn't . . . it's a little ambiguous. I think it just factors into the whole analysis of whether what the United States did was reasonable. And again, had Machado come back into the United States and contacted the agent, and the agent hadn't followed up with him, that would have been more negligent and would have weighed more heavily against the government. But the absence of those facts show how reasonable . . . It seems to me that you . . . let's assume arguendo that our defendant is absolutely innocent. That's exactly the situation that there was in Baca. Correct. So you still have the comparison to Baca on which you think you could prevail, even with absolute innocence. Correct. If the court has further questions, I'd be happy to address them. Now, I think this is a case you can see the error on the allocution. Is that right? Yes, that's correct. The district court didn't allow him to allocate. Okay. Thank you. Thank you, Your Honor. I ask that you affirm Machado's case. Thanks very much. Mr. Levin, let me ask just one question that we didn't talk about earlier. Was there any prejudice, specific, concrete prejudice that you can point us to, and that you pointed the district court to? With regard to his inability to prepare a complete defense? The delay, et cetera, the fact that, by your lights, the government was not diligent in ascertaining his whereabouts and securing his presence for trial. Essentially, just what I stated previously about failing to contact people that would have known where he was. If we are talking about this defendant's state of mind . . . because of the delay that you would have gotten and would have been able to use to exculpate your client if they had proceeded in a prompt way. There are 40 exhibits, Your Honor, that I tried to introduce into evidence, which the court did not allow me to introduce because I did not have a proper custodian of record. This mortgage company had gone out of business, and because of the delay, I was not able to procure an appropriate witness to introduce some 40 exhibits, which contained, arguably, the forged signature of my client, Mr. Machado. Our defense was, essentially, that he was duped by this Francisco Montero, who was the mortgage broker. Am I correct or wrong that this mortgage company had gone out of business even before the agent went the first time to talk to your client? Judge Hull, that is absolutely correct. I mean, like a year, they've been shut down. They had closed up and, in fact, disappeared. The government was prosecuting people that were related to that entity in 2011. They did go out of business in or about 2009, which certainly was much closer in time than 2017 when this case, or 2016, rather, when this case went to trial. So if I had had the opportunity in 2011 to try this case, it certainly would seem logical. That would have been two years after the mortgage company went out of business. And that would have been two years sooner. Two years is a lot sooner than the six years that had elapsed by the time, or seven years. Is there any reason to believe, based on anything in the record, that you could have been any more successful if the gap was only two years rather than six? If I had been able to introduce those 40 exhibits, which were precluded from production. Yeah, I understand that. But that assumes what I'm asking. Is there any reason to believe that you would have been any more successful in finding a custodial witness if he had been secured two years after rather than six? There were names on the documents, other than the individual that we were alleging had set my client up, if you will, that had I been able to procure their attendance at trial, I might have been able to have them authenticate these documents. That would have made a difference. Got it. This was a case where essentially the government proved this case based on documents. It's very difficult to cross-examine paper, as you all know. Is there anything in the record that tells us once it was six years later that you tried to locate somebody who's on these documents, or we don't know what your pretrial work was? There's nothing in the record that does that. There's nothing in the record one way or the other. That's correct. Whether you tried to find them, didn't try to find them. Correct. Couldn't find them. Do I not understand that you did get before the jury a number of instances of the alleged forgeries where your signature did look very different? That is correct. The government was able to introduce some of those exhibits. I was not able to introduce those. I was left with basically putting on a character defense. But the crucial evidence that you couldn't get because of those authenticated documents, the documents that were not authentic, the crucial evidence had to do with those forgeries, and there was such evidence before the jury. Is that not true? That is correct, Your Honor. That is true. However, the impact of those documents being presented by the defendant himself, in my view, would have had far greater impact on this jury than it obviously had. I mean, well, it didn't have any impact because I wasn't able to introduce them. But also, one of the issues that came up in this trial was we tried to introduce the indictment of this Fabrizio Montero, who was indicted in the Middle District of Florida for fraud. The court precluded the introduction of his indictment, which we feel was relevant. It was rejected on relevance grounds. We felt that it was something . . . With respect to that, you did get into evidence that he was investigated, did you not? We did. Thank you. That's all I have. Thank you for your time. Thank you very much. I note, Mr. Levin, that you were court-appointed, and we very much appreciate you taking on this burden of representing your client. Of course, Your Honor. Thank you. Thank you, Ms. Gershaw. We'll proceed to the next witness.